## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHANNEL WALL, as Administratrix: | |
| for the Estate of THOMAS WALL,     : | |
| Plaintiff     : | |
| v.     : | |
| : | |
| DAUPHIN COUNTY; ANTHONY     : | NO.:  1:02 CV 02369 |
| PETRUCCI, President, Dauphin     : | |
| County Prison Board Commission;     : | JUDGE KANE |
| DOMINIC DeROSE, Warden, Dauphin     : | |
| County Prison; LENOARE CARROL,     : | MAGISTRATE JUDGE SMYSER |
| Deputy Warden; DENISE  STEWART,     : | |
| Major; DAVE CAGWIN, Head of     : | |
| Maintenance; ELIZABETH NICHOLS,     : | |
| Deputy Warden; WAYNE K. ROSS, M.D.;  : | |
| GRAHAM HETRICK, Coroner;     : | JURY TRIAL DEMANDED |
| JOHN DOES 1-20, Prison Guards,     : | |
| Defendants     : | |

## DEFENDANTS' CONCISE STATEMENT
## OF UNDISPUTED MATERIAL FACTS

And now, come defendants, by and through their attorney, Lavery, Faherty,

Young & Patterson, P.C., and file this concise statement of undisputed material facts

and in support thereof aver as follows:

### I. BACKGROUND

1.  Anthony Petrucci, currently serves as a Dauphin County Commissioner

and was first elected to that position in November, 1991.   While County

Commissioner, Petrucci has also served as the Chairman on the Dauphin County

Prison Board of Inspectors, which sets policy for and provides oversight of the Dauphin County Prison.   (Petrucci, DEC. #1-2)

2.   Dominick DeRose is currently employed as the Warden at the Dauphin County Prison.  DeRose has been employed in that capacity continuously since July, 1992. (DeRose DEC. #1)

3.   Leonard Carroll is currently employed as a Deputy Warden for Security at the Dauphin County Prison and has served in that capacity since 1991.  As a deputy warden of the Dauphin County Prison, Carroll's responsibilities include supervision of the security staff at the Prison. (Carroll DEC. #1-2)

4.   Dennis Stewart is currently employed as the Custody Major at the Dauphin County Prison and has served in that capacity since September, 1993.   As the Custody Major, Stewart is in charge of security and supervises all of the uniformed officers at the prison. (Stewart DEC. #1-2)

5.   David Cagwin is currently employed as the Maintenance Supervisor at the Dauphin County Prison and has served in that capacity for more than 22 years.  As Maintenance Supervisor, Cagwin is responsible for building and system maintenance at the Dauphin County Prison, including the two heating and ventilation ("HV") systems that serve the gymnasium. (Cagwin DEC. #1-2)

6.   Elizabeth Nichols is currently employed as the Deputy Warden for Treatment at the Dauphin County Prison.  Nichols has served in that capacity since

July 20, 1992.  As Deputy Warden for Treatment, Nichols' responsibilities include the oversight of the medical services provided to the inmates at the Dauphin County Prison by the contracted medical provider (Nichols DEC. #1, 3)

## II. ARREST AND DETENTION OF ILEEM WELLS ON THE OUTSTANDING CAPIAS

**7.**  Lowell Witmer is the Clerk of Court for the Court of Common Pleas of Dauphin County, Pennsylvania, the 12th Judicial District of Pennsylvania.  Witmer was first elected in November, 1987 and was sworn in to that position in January, 1988.  Witmer has served continuously in the position of Clerk of Court since January, 1988.  (Witmer, DEC. #1-2)

8.  Among the powers and duties of the Office of Clerk of Court is to file and maintain all documents relating to criminal matters in the 12th Judicial District, including all related motions and filings.  Witmer also enters all criminal judgments, exercises the authority of the Clerk of Courts as an officer of the court, and affixes and attests the seal of the court to all the process thereof and to certifications and exemplifications of all documents and records pertaining to the Office of the Clerk of Courts. (Witmer, DEC. #3)

9. In his capacity as Clerk of Courts, Witmer has filed and maintained records relating to the criminal prosecution of Ileem Wells, a/k/a Jerome Smith, on drug charges.   A true  and  correct  copy  of  the  docket  entry  is  in  the  matter  of Commonwealth  of  Pennsylvania  v.  Ileem  Wells,  a/k/a  Jerome  Smith,  Docket

3

Number 2405 CD 1999 in the Court of Common Pleas of Dauphin County, Pennsylvania are attached as Exhibit 1 to Witmer's Declaration. (Witmer, DEC. #4; Exhibit 1)

10.   On the evening of July 14, 1999, Ileem Wells, a/k/a Jerome Smith, (D.O.B. 04/10/1974, Social Security Number 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), was arrested by Officer LaValle Jenkins of the Harrisburg Bureau of Police and charged with possession with intent to deliver a controlled substance (Crack/cocaine) a felony charge.   True and correct copies of the criminal complaint and probable cause affidavit from that case are attached as Exhibit 2 to Witmer's Declaration. (Witmer, DEC. #5; Exhibit 2).

11.   According to the dockets filed of record in the Clerk of Court's office by the District Justice, Ileem Wells appeared in Dauphin County night court for a preliminary arraignment later that evening.   Following the preliminary arraignment, the District Justice set bail at $25,000.   (Witmer, DEC. #6)

12.   According to the documents filed of record in the Clerk of Court's office by the District Justice, on July 26, 1999, Ileem Wells and assistant public Defender, John Fabriele appeared before District Justice Joseph Solomon regarding the preliminary hearing.   The defendant waived the preliminary hearing and bail was reduced to $10,000.   True and correct copies of the documents from the preliminary

hearing are attached as Exhibit 3 to Witmer's Declaration. (Witmer, DEC. #7; Exhibit 3).

13. According to the documents filed of record in Witmer's office by the District Justice, on July 26, 1999, District Justice Solomon also served notice on the Defendant that his formal arraignment was scheduled for September 10, 1999 before the Court of Common Pleas of Dauphin County. A true and correct copy of the Notice of Formal Arraignment is attached as Exhibit "4" to Witmer's Declaration. (Witmer, DEC. #8; Exhibit 4)

14. On September 9, 1999, the District Attorney filed an Information charging Ileem Wells with unlawful delivery of a controlled substance. A true and correct copy of the information is attached as Exhibit "5 " to Witmer's Declaration. (Witmer, DEC. #9; Exhibit 5)

15. On September 10, 1999, Ileem Wells appeared for formal arraignment on the charge of unlawful delivery of a controlled substance docketed to No. 2405 C.D. 1999. At that time, Defendant entered a plea of not guilty and requested a jury trial. A true and correct copy of the Arraignment is attached as Exhibit "6" to Witmer's Declaration. (Witmer, DEC. #10, Exhibit 6)

16.    Ileem Wells' trial on the unlawful delivery of a controlled substance charge was originally scheduled for October 11, 1999, but was continued at the request of the Defendant's counsel. (Witmer, DEC #11)

17.    On January 12, 2000, Defendant was scheduled to appear before The Honorable Clarence C. Morrison, President Judge of the Court of Common Pleas of Dauphin County, on the charge docketed to No. 2405 C.D. 1999.  Defendant failed to appear and President Judge Morrison ordered that a Capias be issued and that the Defendant forfeit his bail.  A true and correct copy of the January 12, 2000 courtroom sheet is attached as Exhibit "7" to Witmer's Declaration.  (Witmer, DEC. #12; Exhibit 7)

18.    Pursuant to President Judge Morrison's Order, I issued a Capias on January 12, 2000 for Ileem Wells for his failure to appear at trial on the criminal charges docketed to 2405 C.D. 1999.  A true and correct copy of the Capias is attached as Exhibit "8" to Witmer's Declaration.  (Witmer, DEC. #13, Exhibit 8)

19.    According to the documents filed of record in Witmer's office by the Sheriff's Office, on July 23, 2001, the Dauphin County Sheriff's Office transported Ileem Wells from a detention facility in Philadelphia to the Dauphin County Prison.  True and correct copies of the Dauphin County

Sheriff's transportation log sheets from July 23, 2001 are attached as Exhibit "9" to Witmer's Declaration.  (Witmer, DEC. #14, Exhibit 9)

20.    By Order dated August 31, 2001, Judge Lewis granted the Commonwealth's Application for a Nolle Prosequi on the charges docketed to No. 2405 C.D. 1999 due to the fact that the Defendant, Ileem Wells, had passed away while in custody awaiting trial.  A true and correct copy of Judge Lewis' August 31, 2001 Order is attached as Exhibit "10" to Witmer's Declaration.  (Witmer, DEC. #15, Exhibit 10)

21.  None of the individuals named as defendants in plaintiff's civil action had any personal involvement with the Capias issued by the Honorable Clarence C. Morrison, President Judge of the Court of Common Pleas of Dauphin County, on January 12, 2000 after Ileem Wells failed to appear at trial on the criminal charges pending against him. (Petrucci, DEC. #8; DeRose, DEC. #8; Carroll, DEC. #6; Stewart, DEC. #7; Coldren, DEC. #11; Nichols, DEC. #8)

22.  None of the individuals named as defendants in plaintiff's civil action had any knowledge of and/or personal. Involvement with the decision made by the Philadelphia law enforcement officials to detain Ileem Wells on the outstanding Capias issued by President Judge Morrison in the

underlying criminal case.   (Petrucci, DEC. #9; DeRose, DEC. #9; Carroll, DEC #7; Stewart, DEC #8; Coldren, DEC. 12; Nichols, DEC. #9)

23.   None of the individuals named as defendants in plaintiff's civil action had any knowledge of and/or personal involvement with the transportation of Ileem Wells, by the Dauphin County Sheriff's Office, from a detention facility in Philadelphia to the Dauphin County Prison on July 23, 2001.   (Petrucci, DEC. #10; DeRose, DEC. #10; Carroll, DEC. #8; Stewart, DEC. #9; Coldren, DEC. #13; Nichols, DEC. #10)

III.   **HEATING AND VENTILATION SYSTEM IN THE PRISON GYM**

23.   The gymnasium is served by two HV systems.   The two HV systems in the gym are dedicated systems that serve only the gym.   The two systems are identical.   Each consists of a rooftop air handling unit, a supply air ductwork system, a return air ductwork system, and controls. Each rooftop air handler contains a supply fan, an exhaust fan, an outdoor air inlet, a heating coil and dampers.   The air handler delivers a constant volume of air to the supply air ductwork system.   A constant volume of air is returned to the unit via the return air ductwork system. (Cagwin Report, p.2)

24.  The units can operate in heating mode or ventilating mode.  When in the heating mode, a minimum amount of outdoor air is drawn into the unit.  The outdoor air is mixed with return air form the gym.  The mixed air is drawn across a heating coil, through the supply fan and delivered to the gym through the supply air ductwork system.  When in the ventilating mode, dampers within the unit change position and the exhaust fans operate.  In this mode the unit supplies 100 percent outdoor air to the gym.  Hot air is exhausted from the gym through the return air ductwork system by the exhaust fan.   At the time of Wall's collapse, the unit was operating in the ventilating mode.  (Cagwin Report, p. 2)

25.  The supply air ductwork systems consist of ductwork that drops down from the rooftop air handlers, distribution ductwork that runs across the gym just under the roof, and supply air diffusers.  Each system has seven supply air diffusers.  The diffusers are designed to circulate the air throughout the gym.  During a site inspection on October 21, 2003, Cagwin detected air movement from the supply air diffusers at floor level in all areas of the gym.  The return air ductwork systems consist of return air grilles near the floor, return air duct shafts, and ductwork that connects the top of the shafts to the air handling units (Cagwin Report, p. 2)

9

26.   This heating and ventilating system is typical of HV system in gymnasiums.  The system did not provide any air conditioning to the gym. This is typical of many gymnasiums.  The ASHRAE Applications Handbook states:

> Many school gymnasiums are not air conditioned.  Low-intensity perimeter radiant heaters with central ventilation supplying four to six air changes per hour are effective and energy efficient. Unit heaters located at the ceiling are also effective.  Ventilation must be provided due to high activity levels and resulting odors.  (Cagwin Report, pp. 2-3)

ASHRAE   Standard 62-1999, Ventilation for Acceptable Indoor Air Quality is the industry standard for ventilation rates within buildings.   The standard's purpose is:

1. **Purpose**

The purpose of this standard is to specify minimum ventilation rates and indoor air quality that will be acceptable to human occupants and are intended to minimize the potential for adverse health effects.   (Cagwin Report, p. 3)

27.    Table 2 of the Standard, "Outdoor Air Requirements for Ventilation", lists the outdoor air requirement for gymnasiums as 20 cubic feet per minute (cfm) per person as 20.  This requires that for each person in the gymnasium, 20 cfm of outdoor air is required.  The Mechanical Systems Audit for the Dauphin County Prison prepared by Flood & Sterling, Inc., dated December 30, 1985, shows the airflow for the HV systems in the gym.  The report shows that the total supply air to the gym was 18,534 cfm.  Since the unit was operating in summer mode, 100% of this was outdoor air.  According to architectural drawings, the gym is 120 ft. long, 50 ft. 8 in. wide, and 26 ft. 6 in. high.  This gives a volume of 161,226 cubic feet.  A supply airflow rate of 18,534 cfm in a volume of 161,226 cubic feet gives an air change rate of 6.9 air changes per hour.  This is 15% grater than the maximum air rate recommended by the ASHRAE Applications Handbook. (Cagwin Report, p.3)

28.  There are conflicting reports about the number of people that were in the gym at the time of the incident.  The maximum number of people who could have been in the gym is 139.  This is the number of inmates in cell blocks A and B plus 3 correctional officers.  However, it is reported that all inmates who were in the gym at the time of Wall's collapse were

interviewed.   The number of inmates interviewed is 41.   Adding three correctional officers brings the number of people to 44.  Since the unit was in ventilation mode, the 18,534 cfm of air being supplied to the gym was 100% outdoor air.  With 44 people in the gym the outdoor air ventilation rate is 421 cfm per person.  This is 21 times greater than that required by ASHRAE Standard 62-1999.  With 139 people in the gym the outdoor air ventilation rate is 133 cfm per person.  This is 6.6 times greater that that required by ASHRAE Standard 62-1999. (Cagwin Report, p.3)

29.  Based upon his analysis of the temperature data and based upon his engineering calculations, Mr. Cagwin concluded that the temperature inside of the gym at the time that Wall collapsed was between 87°F and 91.7°F.  These temperatures are lower than the outside air temperature at that time.  (Cagwin Report, p. 5)

30.   National   Institute   of   Occupational   Safety   and   Health (NIOSH)publication   86-113,   Criteria   for   a   Recommended   Standard: Occupational Exposure to Hot Environments states in part:

> …the   environmental   variables
> concerned   with   convective   heat
> exchange between the worker and the
> ambient   environment   are   dry   bulb
> temperature (Ia) and the speed of air

movement (Va).  When air temperature is higher than the mean skin temperature (Tsk of 95ºF), heat is gained by convection.  The rate of heat gain is dependent on temperature differential (Ia –Isk) and the air velocity, (Va). Where (Ia) is below (Isk), heat is lost form the body; the rate of Isk is dependent on Ia-Isk) and air velocity.

The temperature in the gym at the time of Wall's collapse was between 87ºF and 91.7ºF.  This is between 8ºF and 3.3ºF lower than the mean skin temperature mentioned in NIOSH publication 86-1113.    This temperature difference combined with the air velocity from the supply air diffusers would have allowed Wall's body to lose heat to the air in the gym. (Cagwin Report, p. 5)

31.   It was Mr. Cagwin's professional opinion within a reasonable degree of engineering certainty that:

A.  The heating and ventilation system in the gymnasium of the Dauphin County Prison met the standard of care for a gymnasium heating and ventilating system.

B.  The air change rate in the gymnasium at the time of Thomas Wall's collapse was 15% greater than that recommended by the ASHRAE Applications Handbook.

C.  The amount of outdoor air ventilation being provided in the gymnasium at the time of Thomas Wall's collapse was between 6.6 and 21 times greater than that required by

ASHREA Standard 62-1999 Ventilation for Acceptable Indoor Air Quality.

D.  The temperature inside the gym at the time of Wall's collapse was between 87°F and 91.7°F.  This is the same temperature as the outside temperature.

E.  The temperature conditions in the Dauphin County Prison gymnasium were below the mean skin temperature.  At these temperatures, Wall's body would have been cooled by the air in the gym.

(Cagwin Report, p.6)

32.  Inmates incarcerated in state prisons in Florida, Texas and Arizona never experience the effects of any air conditioning, not even in the housing areas of the prisons (Parrish Report, p.2)

33.  David Parrish, a jail administrator for over twenty-two  years, has opined that the staff of the Dauphin County Prison provided a safe and appropriate environment for the inmates in the facility. (Parrish Report, p. 3)

34.  There have been no alterations or modification of the HV system in the gymnasium from the date of their installation.  (Coldren, DEC. #3)

35.  Jamie Todd Sweigard is currently employed as the Assistant Maintenance Supervisor at the Dauphin County Prison and has held that position since 1995. Sweigard's duties include assisting the maintenance supervisor with building and

system maintenance at the Dauphin County Prison, including the two heating and ventilation systems that serve the gymnasium. (Sweigard, DEC. #1)

36.  The HV systems in the gym are on a three month preventive maintenance schedule, which include changing the filters, checking the coils and cleaning if necessary, checking the belts and replace them as needed, checking the return vent and greasing the fan bearings.  (Coldren, DEC. #4; Sweigard, DEC. #2).

37.  Prior to August 6, 2001, the roof top HV units at the north end and south end of the gym were both serviced on June 13, 2001 and there were no reported problems at that time. Both units had been serviced in March, 2001 as part of the preventive maintenance program.  (Coldren, DEC. #5; Sweigard, DEC. #3)

38.  The roof top HV units at the north end and south end of the gym constantly operate in the ventilating mode in the summer months, to circulate the air within the gym. (Coldren, DEC. #6)

39.  Prior to August 6, 2001, neither David Coldren, the Maintenance Supervisor, nor Jamie Sweigard, the Assistant Maintenance Supervisor was aware of any heat related medical problems of any inmate using the gym.  (Coldren, DEC. #7; Sweigard, DEC. #4)

40.  The roof top HV systems  in the gym were operating on August 6, 2001, circulating the air within the gym as they were designed to do.  (Coldren, DEC. #8; Sweigard, DEC. #5).

41. David Coldren did not receive any complaints on August 6, 2001 of any problems with the HV systems, nor did he receive any complaints that day regarding excessive heat in the gym. (Coldren, DEC. #8)

42.   After Inmate Wells collapsed in the gym, Jamie Sweigard and Joseph Hurrell, a maintenance man, went to the gym with a gauge to take temperature and humidity readings and record their findings. Sweigard and Hurrell began taking the temperature readings at approximately 1:35 p.m. (Sweigard, DEC. #6)

43.   Sweigard made a drawing of the gym and both Sweigard and Hurrell read the gauge and Hurrell recorded the readings.  Sweigard verified that the information was accurate  and Hurrell was recording it on the sheets. The temperatures ranged from 86ºF to 90ºF, with an average of 88ºF.  The humidity ranged from 44.0% RH to 45.0% RH with an average of 44.6% RH. (Sweigard, DEC. #7, Exhibit 1; Cagwin Report p.4)

IV.  THE EXTRAORDINARY OCCURRENCE INVOLVING
INMATE ILEEM WELLS ON AUGUST 6, 2001

44.   Patrick M. Corkle has worked at the Dauphin County Prison for 17 ½ years and has held the rank of Captain since 1994.  He was on duty on August 6, 2001 at the Dauphin County Prison. (Corkle, Dep. pp. 6-7, 11)

45.  At approximately 3:00 a.m. on August 6, 2001, the night shift commander of C-Platoon, Joseph Lahr, made the decision to have recreation in the gym later that day.  (Corkle Dep., pp. 11-12)

46.  On August 6, 2001, from 12:30 until 2:00 C. O. James Beaston was assigned to the gym.  When he got to the gym that day at 12:30, he observed some inmates playing basketball, some sitting, some were walking around and some were talking to friends. (Beaston, Dep. pp. 27-29, 38)

47.  During recreation, if an inmate is in the gym and feels sick, the corrections officer will open the door and the inmate can go back to the cell block, the officer will also call the block via the radio and indicate that the inmate is returning and needs to be seen by medical. (Beason, dep. p. 38)

48.  Beaston saw the inmate collapse that day while playing basketball. Beaston physically observed inmate Ileem Wells fall down and collapse while he was dribbling and playing basketball.  (Beaston, Dep. pp. 55, 76)

49.  Tom from medical had been in the gym for several minutes before the inmate collapsed to dispense medications to another inmate.  (Beaston, Dep. pp. 74-75)

50.  Tom from medical and C. O. Beaston were next to the inmate within seconds after he collapsed.  The inmate was lying down and Tom did the standard

first aid, checked his pulse, respiratory and checked for vital signs.  (Beaston, Dep. pp. 77-79, 85-88)

51.  C. O. Stanley Brown was also on duty on August 6, 2001 and arrived at the Prison gym at around 12:30.  (Brown, Dep. p. 46)

52.  The doors to the gym were open that day.  They were left open for ventilation because it was warm in the gym. Brown was not aware of any complaints by other correctional officers as to heat in the gym. (Brown, Dep. pp. 51, 53)

53.  Brown was outside the gym when he was notified by Beaston that someone had collapsed in the gym.  Brown went inside the gym, called central control and Captain Corkle responded. (Brown, Dep. pp. 54-55)

54.  Tom Toolan from the medical department was there in the gym, began to assess the inmate. While Brown had some medical training classes at the Prison, since a medical professional was there, that individual should make the assessment of this situation.  The medical person would also determine whether it was necessary to call 911. (Brown, Dep. pp. 57-61)

55.  Captain Corkle heard a radio call that an inmate was down in the gym. Corkle responded to the gym and the initial order was to move the inmates back away from Inmate Wells. (Corkle, Dep. pp. 20-23)

56. Corkle checked Inmate Wells' pulse and observed his breathing while Tom Toolan from the medical department was making an assessment of Wells' condition. (Corkle, Dep. pp. 23-25)

57.  According to Corkle's recollection, Tom Toolan from medical was with Inmate Wells the entire time.  While with him, Toolan was monitoring the inmate's condition.  Toolan is the contracted medical administrator and Corkle relied on Toolan on whether or not an ambulance needed to be called. While in the gym, Toolan never indicated an ambulance needed to be called. (Corkle Dep. pp. 73-74)

58.  Corkle then called for a stretcher and believes that a few minutes elapsed from the time he arrived at the gym to the time that Wells was put on the stretcher. (Corkle, Dep. pp. 30-31)

59.  Inmate Wells was loaded on to the stretcher and carried to the main side medical.  Upon arrival in medical, Inmate Wells was still breathing and had a pulse.

60.  At 1312 hours, medical administrator Tom Toolan advised Corkle that an ambulance should be called.  At that time, Corkle called Dauphin County communications and advised them of the situation.  While Corkle was on the telephone with the communications center, he observed physician assistant Macut start CPR. (Exhibit S – Report of extraordinary occurrence, p. 2)

V.  MEDICAL TREATMENT

61.  The Dauphin County Prison has contracted with PrimeCare Medical, Inc., to provide medical services to inmates at the facility including utilization review, case management and emergency medical services. There are no Dauphin County employees assigned to the medical department at the Dauphin County Prison. (Nichols, DEC. #2)

62.  It is the policy, practice and custom of the Dauphin County Prison that all inmates are to receive reasonable and medically necessary care in accordance with state and federal laws in the United States Constitution. (Nichols, DEC. #4)

63.  David Parrish, a Jail Administrator for more than 22 years has reviewed this matter and has opined that defendants provided excellent and timely medical service. Of the thirty three hundred jails in the United States, only a few are medically accredited by the National Commission on Correctional Health Care (NCCHC).  The Dauphin County Prison is one of those facilities which are accredited by the NCCHC.  In Mr. Parrish's professional opinion, the decedent's initial medical screening, subsequent history, and physical and ultimate treatment upon his collapse, were all up to the standards outlined in NCCHC guidelines. (Parrish Report, pp. 1-2)

64.  Thomas Toolan completed the LPN program at Monroe County Vo-Tech in June, 1991.  Since June, 2001, he has been employed by PrimeCare Medical Inc.,

and serves as the contract administrator of the Dauphin County Prison Medical Department.  He was previously the contract administrator for the Monroe County Correctional Facility. (Toolan, Dep. pp. 6-8)

65.  Toolan is involved in treatment of all inmates and all aspects of their care at the Dauphin County Prison.  He does not recall ever treating any inmate for heat related injuries, but has received training in that area. (Toolan, Dep. pp. 9-11)

66.  On August 6, 2001, Toolan was in indoor recreation to dispense medication to another inmate when he heard a commotion near the basketball court to the right. (Toolan, Dep. p. 16)

67.  Toolan went over and saw the inmate lying on the floor.  His arms and legs were outstretched and appeared to be stiff.  Initially, Toolan got down on his knee to see if the inmate was responsive and he was not.  Toolan touched the inmates arm and felt tremors.  Toolan thought he was going through a seizure, so he told everyone to back away to give the inmate room. Toolan made sure the inmate's airway didn't appear compromised and the inmate appeared to be breathing normally and his skin was clammy.  (Toolan, Dep. pp. 25, 26)

68  When the inmate was on the floor and Toolan took his pulse, Toolan recalled the pulse was 62 and it was a regular beat.  Toolan also checked his respiration (20/minute) by counting the rising and falling of his chest.  Toolan also

observed to make sure he didn't regurgitate and to insure that he maintained a safe environment.  (Toolan, Dep. pp. 27, 33-34)

69.  From the symptoms Toolan saw, he believed that the inmate was having a seizure.   Prior to that day, Toolan had received training seizure disorders in nursing school.  (Toolan, Dep. pp. 43-44)

70.  Nurse Lindsay Snowen came with a stethoscope and blood pressure cuff. When nurse Snowen could not get his blood pressure, or at least couldn't hear it above the noise in the gym, they were still able to feel a pulse which meant circulation  in the heart was still working.  At that time, Toolan did not ask that an emergency response team be called. Toolan then decided to take the inmate to the medical department.  (Toolan, Dep. pp. 61-62)

71.    Joseph Douglas Macut is a Physician Assistant, licensed by the Commonwealth of Pennsylvania and has been so licensed continuously since 1981. Macut passed his National Physician Assistance via certification examination in the fall of 1981 and he also obtained a two year master's degree in health education to the Pennsylvania State University approximately eight years ago. (Macut, DEC. #1, 2)

72. Since March, 1999, Macut has been employed by PrimeCare Medical, Inc. and assigned to the Dauphin County Prison. Prior to employment with PrimeCare, Macut was employed for 17½ years as a physician assistant at the

Cardiovascular Surgical Institute, where he was involved with the care of thousands of cardiac patients over the years.  (Macut, DEC. #3, 4)

73.  As a physician assistant, Macut has completed a minimum of 100 hours of continuing medical education, every two years and he has been recertified as a physician assistant every six years.  Macut has also been recertified in CPR on an annual basis. (Macut, DEC. #5)

74.  As a physician assistant at the Dauphin County Prison, Macut conducts the daily P.A. line and evaluates and/or treats up to 40 inmates per day.  Macut is also involved with emergency medical treatment, seeing new intakes for initial medical assessments, and conducting initial physicals and/or annual physicals of the inmates. (Macut, DEC. #6)

75.  Prior to August 6, 2001, P. A. Macut cannot recall ever treating any inmates for any heat related medical problems from the gym.  (Macut, DEC. #7)

76.  On August 6, 2001, Macut was working the 8:00 a.m. to 4:00 p.m. shift in the medical department at the Dauphin County Prison. Other than Inmate Ileem Wells, Macut did not treat any other inmates for heat related medical problems from the gym that day. (Macut, DEC. #8)

77.  Macut was down on Q-Block when he received a telephone call that an inmate had collapsed in the gym.  Macut responded to the main medical department where they were taking the inmate. (Macut, DEC. #9)

78.  Upon Macut's arrival in the medical department, inmate Wells had been laid on the floor of the main intake area and Macut did not note any respirations. Macut immediately started CPR. (Macut, DEC. #10)

79.  Macut was doing CPR at the patient's chest and Sgt. Miller, also an emergency medical technician, was the patient's head. Sgt. Miller had the shield out, had inserted an airway (a plastic tube to keep the trachea open so it doesn't collapse) and was using the Ambu bag as part of the CPR process. (Macut, DEC. #11)

80.  Macut was involved with CPR on the patient for a couple of minutes and then the EMT's arrived in the medical department and assumed the medical care of the patient. (Macut, DEC. #12)

81.  Paul Sheaffer is a certified EMT with Tri-Community Ambulance.  He was previously employed as a police officer and had advanced first aid and CPR training during his police career. (Sheaffer, Dep. pp. 11-16)

82.  On August 6, 2001, they received a call from Dauphin County Dispatch and responded to the Dauphin County Prison.   (Sheaffer, Dep. pp. 20-230

83.  When the EMT's arrived at the Prison, there were individuals performing CPR on the inmate -- one was doing the chest, and the other was doing breathing. Sheaffer examined the individual and saw no signs of trauma such as bruising, lacerations, or bleeding from any orphic.  (Sheaffer, Dep. pp. 33, 41, 51)

84.   In his report, he indicated "no remarkable incident" from exam, which means there were no signs of trauma on the patient. (Sheaffer, Dep. p.51)

85.   Immediately upon arrival in the medical department, the EMTs took over the medical treatment and Sheaffer was involved with the CPR. (Sheaffer, Dep. pp. 48-49).

86.   Members of the Advanced Life Support team arrived minutes after the EMTs had arrived at the Prison and they assumed the treatment of the patient.  The patient was then transported to the emergency room at the Harrisburg Hospital and they continued to do CPR on the patient all the way to the Hospital. (Sheaffer, Dep. pp. 25, 49-50)

## VI,  POST MORTUM AND DEFENSE FORENSIC PATHOLOGIST'S REPORTS

87.   Wayne Ross, M.D., a specialist in forensic pathology and neuropathy who performs over 400 autopsies per year, performed an autopsy on Ileem Wells on August 7, 2001.   After conducting the autopsy and reviewing the patient's history, Dr. Ross opined that the cause of death is seizure disorder due to hypertrophic cardiomyopathy, myocaroitis, and neurovasculitis.   The RPR is reactive for syphilis. The changes to the heart and brain are consistent with syphilis.   The manner of death is natural.  (Ross, Dep. pp. 6-13, post-mortem report, p.7)

88.   Dr. Ross testified that in his professional opinion, Inmate Wells did not have a heat stroke.   Dr. Ross analyzed the body and found no stigmata of heat stroke related processes.   He also analyzed lab data, looked at anatomic findings of the body, and analyzed and used secondary ancillary information before concluding that the inmate did not have heat stroke.  (Ross, dep. pp 31-38)

89.   Dr. Ross received information from the Coroner's office that the temperature of the body was 102.9ºF, but while that temperature was elevated, it was not excessive and not consistent with heat stroke.   If the body temperature is 105 or 106ºF, without any other reason or basis, then it could be consistent with heat stroke.   Dr. Ross looks at the body temperature in conjunction with everything else

and factors in that temperature elevation can occur due to inflammation/infection of the system and temperatures are known to go up post mortem. (Ross, dep. pp 31-38)

90.   Isidore Mihalakis, M.D., a Board certified forensic pathologist, agreed with Dr. Ross that the manner of death of Inmate Wells was natural. (Mihalakis report, p2)

91.   In his professional opinion, Dr. Mihalakis did not believe that hyperthermia/heat exhaustion/heat stroke has anything to do with the death if Ileem Wells for the following reasons:

A. The temperature of almost 103 degrees is not that terribly high; many decedents have a small rise in temperature immediately after death, especially if they were in some sort of vigorous activity, and this has nothing to do with hyperthermia. Additionally, there are individuals whose temperatures have been known to rise as a result of vigorous physical activity.

B. A hyperthermic death is much more prolonged and individuals so affected will survive a much longer period of time that Mr. Wells.  Hyperthermic people do not just drop dead out of the clear blue sky.

Signs of heat stroke include not only hyperthermia of around 105-to-106 degrees or higher, they also involve hot, flushed, dry skin, and Mr. Wells' body was described as very sweaty.  If we ignore the sweaty body, we cannot ignore the fact that he did not have a hot, flushed face; his was clammy.

Heat stroke is associated with tachycardia and Mr. Wells had bradycardia.  At the time of his collapse, the pulse was 62 and regular, subsequently decreasing to 54 and then stopping altogether.

There is hypotension but this is not a sudden, shocky phenomenon, but rather goes on for a period of time before the collapse.

There is hyperventilation and there is no evidence that Mr. Wells was breathing rapidly. The respirations went from 20 to gasping and agonal.

Lastly, there may be rhabdomyolysis with dark urine, which is not described either on the floor when he lost his urine or in the urinary bladder at the time of the autopsy.

C.    <u>Symptoms</u> of heat stroke include nausea, vomiting, dizziness, muscle cramps, difficulty breathing, feeling of warmth, altered sensorium with some confusion and/or disorientation, inability to concentrate, paresthesias or abnormal feelings in the hands and feet and ankles as a result of the rapid breathing (which causes alkalosis).  The facial appearance becomes hot, flushed and dray as a result of adrenergic stimulation.  None of these are described in any of the material I have reviewed as being representative of Mr. Wells' feelings prior to collapse.

Thus, I repeat, there is no evidence that this is a heat stroke or heat exhaustion-type death and every evidence that this is cardiac death.

D.    Lastly, if this were truly a heat stroke death, one would expect other inmates who participated in this basketball game to be affected.

(Mihalakis' Report, pp. 2-3)

92.  It is Dr Mihalakis' opinion, within reasonable medical certainty, that the cause of Inmate Wells' death was sudden cardiac death during exercise with or without long-term effects of cocaine use.   It was his further opinion, within

28

reasonable medical certainty that the prison gym temperature/conditions did not contribute to the death of Mr. Ileem Wells.  (Mihalakis' report, p.4)

## VI. <u>SUPERVISORY LIABILITY CLAIMS</u>

93.  As Warden, if defendant DeRose receives a complaint of mistreatment and/or abuse of an inmate, it is immediately forwarded to the Criminal Investigation Division of the Dauphin County District Attorney's  Office for investigation. (DeRose, DEC. #2)

94. Warden DeRose was not aware of any heat related medical complaints from inmates utilizing the Prison gym prior to August 6, 2001. (DeRose, DEC. #5)

95.  Warden DeRose is unaware of any individual treated for heat related medical problems in the gym on or before August 6, 2001.  (DeRose, DEC. #6)

96.  As Warden, Defendant DeRose would never place an inmate in a hazardous condition and/or expose the inmate to an excessive risk to his health or safety within the Prison. (DeRose, DEC. #7)

97.   Warden DeRose had no personal contact with Ileem Wells between July 23, 2001 and August 6, 2001 while Wells was incarcerated at the Dauphin County Prison. (DeRose, DEC. #11)

98.   Warden DeRose received no complaints, requests slips, and/or other documents from Ileem Wells concerning his conditions of confinement at the Dauphin County Prison between July 23, 2001 and August 6, 2001. (DeRose, DEC. #12)

99.   Warden DeRose had no personal involvement in determining whether inmates would have recreation in the yard or in the gym on August 6, 2001, other than to have previously advised the shift commanders generally if it was too hot for recreation outside, that it should be held in the gym.   Additionally, participation in recreation time is voluntary and each inmate decides whether to stay in the cell or go to recreation. (DeRose, DEC. #13)

100. On August 6, 2001, DeRose was away from the facility on Prison business when he was advised that an inmate collapsed during recreation in the gym.  When DeRose arrived at the Prison gym, the inmate had already been taken to the hospital in an ambulance.  Thus, Warden DeRose had no personal involvement in the medical care provided to inmate Ileem Wells after he collapsed on the gym floor while playing basketball. (DeRose, DEC. #14)

101.   Following extraordinary occurrence on August 6, 2001, the Dauphin County Coroner's office conducted an autopsy on the inmate and concluded that the cause of death was seizure disorder due to hypertrophic cardiomyopathy, myocarditis and neurovasculitits.  The autopsy report also noted that the inmate had tested positive for syphilis and that the changes to his heart and brain were consistent with syphilis.  Finally, the coroner's office concluded that the manner of death was natural.  (DeRose, DEC. #15; Petrucci, DEC. #15)

102.   The Criminal Investigation Division of the Dauphin County District Attorney's office conducted an investigation into the extraordinary occurrence involving Inmate Wells on August 6, 2001 and concluded that there was no evidence of foul play.  (DeRose, DEC. #16; Petrucci, DEC. #16)

103.  Deputy Warden Carroll is not aware of any heat related medical complaints of inmates utilizing the prison gym prior to August 6, 2001. (Carroll, DEC. #3)

104.  Deputy Warden Carroll is not aware of any individual treated for heat related medical problems in the gym on or before August 6, 2001 (Carroll, DEC. #4)

105. As Deputy Warden, defendant Carroll would never place an inmate in a hazardous condition and/or expose the inmate to an excessive risk to his health or safety within the prison (Carroll, DEC. #5)

106. Deputy Warden Carroll had no personal contact with Ileem Wells between July 23, 2001 and August 6, 2001, while he was incarcerated at the Dauphin County Prison. (Carroll, DEC. #9)

107. Deputy Warden Carroll had not received any complaints, requests slips, and/or other documents from Ileem Wells concerning his conditions of confinement at the Dauphin County Prison between July 23, 2001 and August 6, 2001. (Carroll, DEC. #10)

108. Deputy Warden Carroll had no personal involvement in determining whether inmates would have recreation in the yard or in the gym on August 6, 2001. Additionally, participation in recreation time is voluntary and each inmate decides whether to stay in the cell or go to recreation. (Carroll, DEC. #11)

109. On August 6, 2001, Deputy Warden Carroll was on duty at the Dauphin County Prison. Deputy Warden Carroll had no personal involvement with the extraordinary occurrence involving Ileem Wells in the gym. Additionally, Deputy Warden Carroll was not present in the gym or

the medical department during the extraordinary occurrence involving Ileem Wells on August 6, 2001. (Carroll, DEC. #12)

110.   The extraordinary occurrence involving Ileem Wells in the gym was referred to the Criminal Investigation Division of the District Attorney's office for investigation.   Deputy Warden Carroll's only involvement with that investigation was to forward paperwork to CID concerning the incident.   (Carroll, DEC. #13)

111.   Custody Major Dennis Stewart is not aware of any heat related medical complaints from inmates utilizing the prison gym prior to August 6, 2001. (Stewart, DEC. #4)

112.   As the Custody Major, defendant Stewart would never place an inmate in a hazardous condition and/or expose the inmate to an excessive risk to his health or safety within the Prison. (Stewart, DEC. #5).

113.   Custody Major Stewart is unaware of any individual treated for heat related medical problems in the gym on or before August 6, 2001 (Stewart, DEC. #6)

114.   Custody Major Stewart had no personal contact with Ileem Wells between July 23, 2001 and August 6, 2001 while he was a pretrial detainee at the Dauphin County Prison. (Stewart, DEC. #10)

115.   Custody Major Stewart received no complaints, requests slips, and/or other documents from Ileem Wells concerning his conditions of confinement at the Dauphin County Prison between July 23, 2001 and August 6, 2001. (Stewart, DEC. #11)

116.   Custody Major Stewart had no personal involvement in determining whether inmates would have recreation in the yard or in the gym on August 6, 2001. Additionally, participation in recreation time is voluntary and each inmate decides whether to stay in the cell or go to recreation. (Stewart, DEC. #12)

117.   Custody Major Stewart utilized sick leave on August 6, 2001 and was not present at the Dauphin County Prison.  Thus, Custody Major Stewart had no personal involvement in the medical care provided to Inmate Ileem Wells after he collapsed on the Prison gym floor while playing basketball. (Stewart, DEC. #13)

118.  On August 7, 2001, Custody Major Stewart attended the autopsy which was performed on Inmate Wells. (Stewart, DEC. #14)

119.   Deputy Warden Nichols is not aware of any heat related medical complaints from inmates utilizing the prison gym prior to August 6, 2001.  (Nichols, DEC. #5)

120.  Deputy Warden Nichols is not aware of any individual treated for heat related medical problems on or before August 6, 2001. (Nichols, DEC. #6).

121.  As Deputy Warden for Treatment, defendant Nichols would never place an inmate in a hazardous condition and/or expose the inmate to an excessive risk to his health or safety within the Prison. (Nichols, DEC. #7).

122.  Deputy Warden Nichols had no personal contact with Ileem Wells between July 23, 2001 and August 6, 2001 while he was incarcerated at the Dauphin County Prison. (Nichols, DEC. #11)

123.  Deputy Warden Nichols received no complaints, requests slips, and/or other documents from Ileem Wells concerning his conditions of confinement at the Dauphin County Prison, including but not limited to the medical condition between July 23, 2001 and August 6, 2001. (Nichols, DEC. #12)

124.  On August 6, 2001, Deputy Warden Nicols had a previously scheduled day off and was not on duty at the Prison that day. (Nichols, DEC. #13)

125.  Deputy Warden Nichols had no personal involvement in determining whether inmates would have recreation in the yard or in the gym on August 6, 2001.  Additionally, participation in recreation is voluntary and each inmate decides whether to stay in the cell or go to recreation. (Nichols, DEC. #14)

126. Deputy Warden Nichols had no personal involvement with the August 6, 2001 extraordinary occurrence involving Ileem Wells in the gym. Additionally, Nichols was not present in the gym and/or the medical department during the extraordinary occurrence involving Inmate Wells on August 6, 2001. (Nichols, DEC. #15)

127.   As Maintenance Supervisor, defendant Coldren would never place an inmate in a hazardous condition and/or expose the inmate to an excessive risk to his health or safety within the Prison. (Coldren, DEC. #10).

128.   David Coldren is unaware of any other individual treated for heat related medical problems on or before August 6, 2001.  (Coldren, DEC. #9).

129. David Coldren had no personal contact with Ileem Wells between July 23, 2001 and August 6, 2001 while Wells was incarcerated at the Dauphin County Prison (Coldren, DEC. #14).

130.   David Coldren received no complaints, requests slips and/or other documents from Ileem Wells concerning his conditions of confinement at the Dauphin County Prison between July 23, 2001 and August 6, 2001. (Coldren, DEC. #15)

131.  On August 6, 2001, David Coldren was away from the facility on prison business when he was advised that an inmate suffered a medical condition during recreation in the gym.  When Coldren arrived at the Prison gym, the inmate had already been taken to the hospital in an ambulance.  Thus, David Coldren had no personal involvement in the medical care provided to inmate Ileem Wells after he collapsed in the gym floor after playing basketball.  (Coldren, DEC. #16)

132.  Commissioner Petrucci is not aware of any heat related medical complaints from inmates utilizing the prison gym prior to August 6, 2001.  (Petrucci DEC. #5)

133.  Commissioner Petrucci is unaware of any individual treated for heat related medical problems on or before August 6, 2001.  (Petrucci DEC. #6)

134.  As chairman of the Prison Board Inspectors, I would never place an inmate in a hazardous condition and/or expose the inmate to an excessive risk to his health or safety within the prison.  (Petrucci DEC. #7)

135.  Commissioner Petrucci had no personal contact with Ileem Wells between July 23, 2001 and August 6, 2001 while he was a pretrial detainee at the Dauphin County Prison.

136.   Commissioner Petrucci received no complaints, request slips, and/or other documents from Ileem Wells concerning his conditions of confinement at the Dauphin County Prison between July 23, 2001 and August 6, 2001.  (Petrucci DEC. #120

137.   Commissioner Petrucci had no personal involvement in determining whether inmates have recreation in the yard or in the gym on August 6, 2001.  Additionally, participation in recreation time is voluntary and each inmate decides whether to stay in the cell or go to recreation. (Petrucci DEC. #13)

138.   Commissioner Petrucci had no personal involvement in the medical care provided to Inmate Ileem Wells on August 6, 2001, after he collapsed on the gym floor while playing basketball.  (Petrucci, DEC. #14)

Respectfully submitted,

Lavery, Faherty, Young & Patterson, P.C.

By: S/ Frank J. Lavery, Jr.
     Frank J. Lavery, Jr., Esquire
     225 Market Street, Suite 304
     P.O. Box 1245
DATE: November 21, 2003     Harrisburg, PA 17108-1245
     (717) 233-6633 (telephone)
     (717) 233-7003 (facsimile)

Atty No. PA42370
flavery@laverylaw.com
Attys for Defendants

## CERTIFICATE OF SERVICE

I, Megan L. Renno, an employee with the law firm of Lavery, Faherty, Young & Patterson, P.C., do hereby certify that on this 21ST day of November, 2003, I served a true and correct copy of the foregoing Statement of Undisputed Material Facts via U.S. First Class mail, postage prepaid, addressed as follows:

Olugbenga O. Abiona, Esquire
Suite 580 The Bourse
21 South Fifth Street
Philadelphia, PA 19106

S/ Megan L. Renno
Megan L. Renno

This document has also been electronically filed and is available for viewing and downloading from the ECF system.